UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
HEALTHPRO BIOVENTURES, LLC,             :
                    Plaintiff,          :
                                        :      10 Civ. 3295 (DLC)
        -v-                             :
                                        :      OPINION AND ORDER[1]
PROMETIC LIFE SCIENCES INC.,            :
                    Defendant.          :
                                        :
----------------------------------------X

APPEARANCES:

For Plaintiff:

Edward P. Grosz
Reitler Kailas & Rosenblatt LLC
885 Third Avenue
New York, NY 10022

For Defendant:

Steven G. Mintz
Mintz & Gold LLP
470 Park Avenue South
10th Floor North
New York, NY 10016


DENISE COTE, District Judge:

    Plaintiff HealthPro Bioventures, LLC ("HealthPro") has

brought this action to recover fees it claims it is owed

pursuant to a consulting agreement that it entered with

defendant Prometic Life Sciences, Inc. ("Prometic").  This

---

[1] This publicly-filed Opinion and Order includes redactions
proposed by the parties and third-party Celgene Corporation,
which has acquired Abraxis BioSciences, Inc.  The unredacted
November 3, 2011 Opinion and Order has been filed under seal.

Opinion addresses the parties' cross-motions for summary judgment.  For the following reasons, both motions are granted in part.

BACKGROUND

The Complaint principally asserts that Prometic breached its obligations to HealthPro under the Re-Amended and Restated Strategic Consulting Services Agreement, which is dated May 31, 2008 (the "May 31 CSA"),[2] by refusing to pay HealthPro a "Success Fee" on two transactions that Prometic concluded with Abraxis BioScience, Inc. ("Abraxis") in December 2009 and February 2010.[3] HealthPro also raises claims under the May 31 CSA relating to the initial transaction between Prometic and Abraxis in 2008. HealthPro seeks (1) an order directing Prometic to deliver to HealthPro an option to purchase 300,000 common shares of Prometic capital stock; and (2) a declaration regarding which components of the 2008 transaction are subject to HealthPro's right to a Success Fee.  Finally, HealthPro alleges claims for attorneys' fees and expenses that it incurred while performing services for Prometic.

_____

[2] Although the May 31 CSA is dated May 31, 2008, it is undisputed that the agreement was not executed until later.

[3] In the alternative, HealthPro claims that under a quantum meruit theory, it is entitled to recover $650,000 for the services it provided to Prometic.  HealthPro has not moved for summary judgment on its quantum meruit claim.

Prometic has raised one counterclaim against HealthPro. Prometic seeks return of fifty percent of the Success Fee paid to HealthPro in connection with the 2008 transaction.

The following facts are not in dispute, unless otherwise indicated.  HealthPro provides advisory services to companies in the pharmaceutical, biotechnology, diagnostic and healthcare industries.  Prometic is a biotechnology company focused on the research and development of various therapeutic technologies, with an eye toward commercializing successfully-developed technologies through strategic partnerships.  Beginning in 2006, Prometic and HealthPro entered into a series of agreements pursuant to which HealthPro agreed to assist Prometic in finding strategic partners for its proprietary technologies.  It is undisputed that the most recent of these agreements, the May 31 CSA, is the controlling contract in this dispute.

I. The May 31 CSA

Under the May 31 CSA, HealthPro agreed to provide Prometic with "business consulting services" to identify "strategic partners" for:

> (i) the licensing of all or any portion of [Prometic's] proprietary rights and technology (tangible or otherwise) <u>described in Schedule A hereto</u> <u>(collectively the "Technology")</u> to any Covered Party (as defined below and listed on Schedule B as amended from time to time as new Covered Party may be added to the Schedule B), or (ii) any other collaborations of a

3

> similar nature, including but not limited to <u>strategic
> investments</u>, acquisitions, mergers, sales of assets,
> <u>relating to the Technology</u> for which [Prometic]
> receives monetary consideration (collectively the
> "Transaction").

(Emphasis supplied.)  Schedule A, in turn, lists five

technologies, including Prometic's "Plasma Protein Purification

Scheme (PPPS) to be implemented to develop, manufacture and

commercialize plasma derived proteins, having orphan drug status

or otherwise, and all products derived therefrom."[4]  Abraxis is

included on Schedule B, the list of Covered Parties under the

May 31 CSA.[5]

Upon execution of a Transaction -- i.e. a license or other

collaboration between Prometic and a Covered Party related to a

Technology -- Prometic agreed to pay HealthPro two forms of

compensation:  a "Project Fee" and a "Success Fee."  Pursuant to

the May 31 CSA, the Project Fee required Prometic to give

HealthPro

---

[4] The other covered technologies are:  PBI-1402, PBI-1393,
Autoimmune Disease Program, and Anticancer Compounds derived
from Prometic's autoimmune disease program.

[5] The May 31 CSA differed from the previous strategic agreements
entered between Prometic and HealthPro in three material
respects.  First, the parties added PPPS to Schedule A.  Second,
the term "strategic investment" was inserted as a type of
investment that gives rise to a Transaction under the agreement.
And, third, the definition of "total consideration" was modified
to exclude "revenues received by [Prometic] arising from any
research and development services, resin sales, or manufacturing
services."

> upon the date of execution of a Transaction, an
> option from its stock option plan to purchase three
> hundred thousand (300,000) of [Prometic's] shares at
> a price equal to the average of the 5 day closing
> trading prices immediately preceding the date of the
> execution of a Transaction.  The option to purchase
> [Prometic's] shares shall be non-refundable, fully
> vested, have a cashless exercise provision, the
> underlying shares shall be freely tradable following
> a 120-day hold period commencing on the date the
> option is granted and the option shall have an
> expiration date of three (3) years after the date of
> execution of a specific Transaction.

(Emphasis supplied.)

The Success Fee applied to Transactions entered between Prometic and Covered Parties "as a result" of the services provided by HealthPro either during the term of the May 31 CSA or "within the twelve (12) month period following its termination" and required Prometic to pay HealthPro 5% of the "Total Consideration [as such term is further defined below] received by Client as a result of the execution of a Transaction."  Total Consideration was defined as

> the following amounts received by [Prometic] as part
> of the Transaction:  (i) the cash purchase price,
> strategic investment, or upfront licensing fee paid
> to [Prometic], any contingent consideration that
> becomes payable upon the occurrence of such
> contingency and other post-closing adjustment, if
> any, of such purchase price, licensing fee and
> contingent consideration, including, but not limited
> to strategic investments and/or milestone payments
> upon such payments being paid to and having been
> received by [Prometic], (ii) the Fair Market Value
> (as defined below) of shares of a Strategic Partner
> issued to [Prometic], (iii) extraordinary dividends
> paid to [Prometic] in cash or the Fair Market Value
> of such dividends paid to [Prometic] in shares, (iv)

5

the amount of forgiveness of [Prometic's] debt, and
(v) the amount of [Prometic's] indebtedness for
borrowed money directly or indirectly assumed by the
Covered Parties, but excluding in each case any
double counting of any such consideration.
[Prometic] and [HealthPro] hereby acknowledge and
agree that no Success Fee shall be paid to
[HealthPro] on other revenues received by [Prometic]
arising from any research and development services,
resin sales, or manufacturing services.

(Emphasis supplied.)  If, however, a

Covered Party in a Transaction is . . . an entity or
person whom [Prometic] has already contacted or held
discussions with on or prior to the date hereof
regarding a potential Transaction, or their
affiliates . . . the Success Fee shall be reduced by
fifty percent (50%) of that which would otherwise be
applicable.

(Emphasis supplied.)

Two other sections of the May 31 CSA are relevant to this

dispute.  Two provisions titled "Indemnity" state in mirror-

image paragraphs that each of the parties indemnifies the other.

For example, one paragraph provides that

[Prometic] agrees to indemnify [HealthPro], its
officers, directors, employees and agents from any
liability, claim or expense, including reasonable
attorneys' fees, arising out of or in connection with
this Agreement or the Services of [HealthPro]
hereunder, except to the extent such liability, claim
or expense is attributable to Advisor's breach of
this Agreement or the gross negligence or intentional
misconduct of [HealthPro], its officers, directors,
employees and agents.

And, finally, a section on "Governing Law" provides that the

Agreement "shall be interpreted under and governed by the laws

of State of Delaware and the United States applicable therein, without giving effect to their choice of law rules."

II. The September 2008 Abraxis Transaction

Following a face-to-face meeting that HealthPro arranged between Prometic and Abraxis CEO Patrick Soon-Shiong ("Soon-Shiong") on May 13, 2008, Abraxis and Prometic signed a letter of intent dated July 29, 2008 (the "2008 LOI").  Prometic CEO Pierre Laurin ("Laurin") had known Soon-Shiong since 1997 or 1998.  At that time, Soon-Shiong had indicated an interest in Prometic's technology and its capability to supply generic versions of drugs.  As of that time, a Prometic subsidiary supplied products to a company owned by Soon-Shiong, American Pharmaceutical Partners ("APP").  Before 2008, however, Soon-Shiong had never discussed the possibility of doing any business with Prometic related to any of the technologies on Schedule A of the May 31 CSA.

The transaction contemplated by the 2008 LOI closed on September 3, 2008 and included seven separate agreements (collectively, the "2008 Abraxis Transaction"):  (1) the [REDACTED] License Agreement (the "2008 [REDACTED] License"); (2) the Securities Purchase Agreement ("2008 SPA"); (3) the Prion Reduction Technology License (the "2008 PRT License"); (4) the [REDACTED] Supply and License Agreement ("2008 [REDACTED]

7

Agreement"); (5) the 2008 Services Agreement; (6) the 2008

Exclusive Manufacturing Agreement; and, (7) a Letter of Intent

regarding future development of certain other proteins (the

"Classical Proteins") using the [REDACTED] process ("2008

Classical Proteins LOI").  The first three of these agreements

as well as the Success and Project Fees that Prometic paid to

HealthPro at the conclusion of the 2008 Transaction are

particularly relevant to this litigation.

    A. 2008 [REDACTED] License

    The 2008 [REDACTED] License describes [REDACTED] as

    [REDACTED]

Pursuant to the 2008 [REDACTED] License, Prometic granted

Abraxis:  (1) a non-exclusive license to use the [REDACTED]

technology (as well as related processes and materials) to

develop and manufacture [REDACTED] (the "Orphan Proteins")

[REDACTED] and (2) an exclusive license to sell and distribute

the Orphan Proteins.[6]  The 2008 [REDACTED] License did not

provide for Prometic to receive any upfront license fee from

---

[6] Each of the Orphan Proteins has a potential therapeutic
application for an "orphan disease," meaning a disease with
fewer than 200,000 sufferers nationwide.

Abraxis in exchange for the license to use the [REDACTED] technology, but it did provide for certain one-time milestone payments,[7] and for Prometic to share generally in the commercial upside of the Orphan Proteins through royalty payments based on net sales.  It is undisputed that if these milestone payments are made, HealthPro will be entitled to recover 5% of any payment as a Success Fee under the May 31 CSA.

B. 2008 SPA

Pursuant to the 2008 SPA, Abraxis acquired 15,677,021 shares of Prometic for $7 million, representing a price per share of around $.45.  Additionally, Abraxis received warrants to purchase additional shares of Prometic at a rate of $.47 per share (under certain circumstances) until March 3, 2012.[8] Prometic concedes that if any of the warrants provided for under the 2008 SPA are exercised, HealthPro is entitled to recover a Success Fee pursuant to the May 31 CSA.

---

[7] Prometic is entitled to one-time milestone payments triggered by certain regulatory approvals and sales thresholds.

[8] Pursuant to the 2008 SPA, Prometic was to deliver two certificates "each representing 15,148,018 Future Investment Rights" to Abraxis when it complied "with the Exchange's insider requirements," and two certificates "each representing 5,598,936 Future Investment Rights" upon:

(i) closing of the definitive documentation regarding the Classical Protein transaction in accordance with the letter of intent dated July 29, 2008 between [Prometic] and [Abraxis] and (ii) [Abraxis] complying with the Exchange's insider requirements.

C. 2008 PRT License

Under the 2008 PRT License, Prometic granted Abraxis the rights to use Prometic's proprietary prion reduction technology ("PRT") in developing [REDACTED].[9]  The preface to the 2008 PRT License states that

> pursuant to the [2008] [REDACTED] License, it was further agreed that, as a complement to the [REDACTED] License, [Prometic] . . . would enter into an additional license agreement pursuant to which Abraxis would be granted certain rights in and to the Prion Technology for the manufacturing of [REDACTED] . . . .

(Emphasis supplied.)

D. 2008 [REDACTED] Agreement

The 2008 [REDACTED] Agreement granted Abraxis the right to use PRT to develop a [REDACTED][10]  The Agreement also set out terms pursuant to which Prometic agreed to supply Abraxis the [REDACTED] necessary to [REDACTED].[11]  As consideration for the license to use PRT, the 2008 [REDACTED] Agreement provides that

---

[9] Laurin explains that a prion is a "protein[] that could become rogue.  It can misfold.  And when it misfold[s], it induce[s] others to misfold -- other prion molecules to misfold, and eventually they form clusters and start cumulating in the brain."

[10] [REDACTED]

[11] The May 31 CSA bars HealthPro from earning a Success Fee based on revenue received by Prometic for "[REDACTED] sales."

Abraxis shall pay to ProMetic a one-time milestone
payment of $1,000,000 upon FDA approval of an NDA or
amendment of an existing NDA for a pharmaceutical
product incorporating the Prion Technology in the
Exclusive Field, on the understanding that Abraxis
shall fund the total costs related to the development
of the Product.

E. 2008 Abraxis Transaction Project and Success Fees

The May 31 CSA obligated Prometic to pay HealthPro both a

Project and a Success Fee in connection with the 2008 Abraxis

Transaction.  Following the September 3, 2008 closing of the

2008 Abraxis Transaction, Prometic paid HealthPro a Success Fee

of $350,000.  And by letter dated December 10, 2008, Prometic

grant[ed] [HealthPro] the option to purchase 300,000
Common Shares of [Prometic] capital stock in
accordance with [Prometic's] stock option plan
("Plan") (the "Options.")

Said Options, granted on December 10th, 2008, are
fully vested and give[] [HealthPro] the right to buy
an equal number of Common Shares of [Prometic] at a
price of $.34 (Canadian) per share.  [HealthPro's]
right to exercise said Options expires on December
10th, 2011.

III. Modifications of the 2008 Abraxis Transaction

Around February 2009, a dispute arose regarding Abraxis's

obligation to reimburse Prometic for costs incurred in

connection with the development of the Orphan Proteins.  By

letter agreement dated May 15, 2009 (the "May 15 Letter

Agreement"), Abraxis and Prometic agreed that the development of

[REDACTED] of the Orphan Proteins -- [REDACTED] -- would be put
on "hold" while the parties [REDACTED]  Additionally, the
parties agreed that the "estimated cost to Abraxis" from
continued work on the [REDACTED] would "not exceed[] US $2
million."  Finally, the May 15 Letter Agreement provided that
"the existing agreements between Prometic and Abraxis shall
remain in effect unchanged unless otherwise modified by this
letter."


IV. 2009 Collaboration Agreement

        [REDACTED]

        On December 17, 2009, Prometic and Abraxis entered into a
second transaction, by executing a Collaboration Agreement (the
"2009 Collaboration Agreement") to work together to
commercialize potential future applications of PRT.[12]  The
agreement defined PRT as

        a novel platform technology for the detection and
        removal of prion from blood, blood derivatives and
        biopharmaceutical products, including resins,
        ligands, materials and devices, as well as the know-
        how useful in the purification of blood and blood-
        derived products in the large-scale manufacture of
        biopharmaceutical products . . . .[13]

---

[12] Prometic administers PRT through Prometic Bioscience, Ltd., a
corporation based in the United Kingdom.

[13] [REDACTED]

Pursuant to the 2009 Collaboration Agreement, Prometic agreed to grant Abraxis a co-exclusive license to PRT on a product-by-product basis.  HealthPro was not involved in the negotiation of the 2009 Collaboration Agreement and did not learn of it until months after the transaction closed.

V. The February 2010 Abraxis Transaction

On February 9, 2010, Wendel executed a document titled "Waiver of Rights" (the "2010 Waiver").  Pursuant to the 2010 Waiver, Abraxis confirmed that it "surrendered for cancellation" the two certificates issued to it under the 2008 SPA representing future investment rights and "forfeited" any right under the 2008 SPA "to be issued any Future Investment Rights or other entitlements."

That same day, Abraxis and Prometic entered two final agreements:  (1) a securities purchase agreement (the "2010 SPA"); and, (2) a loan agreement ("2010 Loan") (collectively, the "2010 Abraxis Transaction").  Through these two agreements, Abraxis invested an additional $13 million (U.S.) in Prometic.  Neither of these agreements refers to any Prometic technology or product, including those listed in Schedule A of the May 31 CSA.

Under the 2010 SPA, Abraxis purchased 17,850,000 shares at a price per share of approximately $.17 (U.S.).  Five days after the closing, Abraxis was also entitled to receive 22,395,744

warrants to purchase additional shares of Prometic (in two groups of 14,495,452 and 30,296,036).  These warrants have an exercise price of $.47 (U.S.) and expire in February 2017.[14] Wendel testified that when Abraxis and Prometic were negotiating the 2010 Abraxis Transaction, "as part of the consideration for making an additional investment," Abraxis wanted Prometic to "reprice the outstanding warrants [from the 2008 SPA] and extend their life."

Pursuant to the 2010 Loan, Abraxis agreed to lend Prometic $10 million (U.S.) at an interest rate of five percent per year. Prometic was obligated to pay the principal and interest back to Abraxis "in five (5) equal installments . . . on the first five anniversaries" of the loan; Abraxis can elect to receive its installment payment in Prometic stock.

HealthPro was not involved in negotiating either component of the 2010 Abraxis Transaction and did not become aware of the deal until after it closed.  By invoice dated February 12, 2010, HealthPro charged Prometic $650,000 as a Success Fee in connection with the 2010 Abraxis Transaction.

---

[14] Correspondence between Abraxis and Prometic indicates that the parties viewed the warrants issued pursuant to the 2010 SPA as a revised version of warrants issued under 2008 SPA.

VI. Procedural History

Prometic filed this lawsuit on April 19, 2010.  Following the close of discovery on May 23, 2011, the parties filed cross-motions for summary judgment.  These motions became fully submitted on July 26, 2011.


DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 225, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

The parties dispute whether Delaware or New York law applies. "Federal courts sitting in diversity look to the choice-of-law rules of the forum state." Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). "It is the general policy of New York courts to enforce choice of law provisions." RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003). HealthPro has failed to identify any applicable exception to this general rule.[15] Consequently, under the New York choice-of-law rule, the choice-

---

[15] Delaware has a reasonable relationship to the parties and the transactions at issue here since the corporation which administers Prometic's [REDACTED] technology is registered in Delaware.

16

of-law provision in the May 31 CSA is controlling and Delaware law applies.  In any event, New York and Delaware subscribe to the same theory of contract interpretation, and the parties do not suggest otherwise.  Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger, 423 F.3d 145, 149 (2d Cir. 2005).

"Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective reasonable third party."  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010).  "When the contract is clear and unambiguous" Delaware courts "will give effect to the plain-meaning of the contract's terms and provisions."  Id. at 1159-60.  But when a court "may reasonably ascribe multiple and different interpretations to a contract, [it] will find that the contract is ambiguous."  Id. at 1160.  "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.  The determination of ambiguity lies within the sole province of the court."  Id.  "If there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended."  Airgas, Inc. v. Air Products and Chemicals, Inc., 8 A.3d 1182, 1190 (Del. 2010) (citation omitted).

I. 2009 Collaboration Agreement

Both parties have moved for summary judgment as to whether, under the May 31 CSA, HealthPro is entitled to recover a Success Fee based on the 2009 Collaboration Agreement.  The 2009 Collaboration Agreement grants Abraxis a co-exclusive license to assess PRT.

Under the unambiguous terms of the May 31 CSA, HealthPro is entitled to a Success Fee if Prometic concludes a strategic transaction (1) resulting from HealthPro's provision of services to Prometic; (2) with one of the parties included in Schedule B of the agreement; and (3) "relating to" one of the technologies listed in Schedule A of the agreement.  It is this last requirement on which this motion turns.  It is undisputed that the 2009 Collaboration Agreement does not refer to any of the technologies included on Schedule A of the May 31 CSA.[16] Instead, the 2009 Collaboration Agreement exclusively addresses PRT.  The parties, therefore, dispute in essence whether a transaction that relates to PRT relates to [REDACTED] as well. [REDACTED] is listed on Schedule A of the May 31 CSA.

Prometic has offered ample undisputed evidence that PRT and [REDACTED] are two distinct technologies and therefore, that a

---

[16] Prometic also contends that HealthPro did not provide any services in relation to the 2009 Collaboration Agreement, but it is not necessary to reach this argument.

strategic investment in one does not "relate to" a strategic investment in the other.  As a preliminary matter, they perform different functions.  [REDACTED]  By contrast, PRT purifies plasma and plasma-derived products, including proteins, of prions.  [REDACTED] and PRT are covered by different patents, each of which is administered by a separate Prometic subsidiary. In the 2008 Abraxis Transaction, Prometic granted Abraxis separate licenses to use [REDACTED] and PRT.  The 2008 [REDACTED] license grants Abraxis the right to use [REDACTED] to [REDACTED].  The 2008 PRT license permits Abraxis to use PRT to develop prion-reduced Orphan Proteins and the 2008 [REDACTED] Agreement grants Abraxis the right to use PRT with [REDACTED]. Since Prometic did not grant Abraxis a license to isolate [REDACTED] using [REDACTED], Abraxis must obtain [REDACTED], to which it then applies the PRT technology.

While both PRT and [REDACTED] are processes that are applied to plasma and can be used in conjunction with each other, this relationship does not mean that a business transaction with one encompasses or "relates to" the other. Schedule A of the May 31 CSA listed five discrete technologies. By its unambiguous terms, it applies solely to transactions that relate to those five technologies and no others.[17]

---

[17] The clear and unambiguous provision of a set of terms in a contract should imply the exclusion of non-listed terms.  See,

The evidence on which HealthPro relies does not suggest that there is any ambiguity in the May 31 CSA that would be relevant to this dispute.  Indeed, HealthPro's evidence actually underscores that the two technologies are distinct.  For instance, HealthPro relies on a Prometic internal document which states that after proteins have been removed from plasma [REDACTED]  (Emphasis supplied.)  Similarly, although HealthPro refers to the 2008 PRT License and Laurin's deposition testimony, both refer to PRT as a "complement" or an "add-on" to [REDACTED].[18]

---

e.g., Shaw Group Inc. v. Triplefine International Corp., 322 F.3d 115, 124 (2d Cir. 2003) ("[W]e are not free to alter the plain terms of an agreement or to strain language beyond its reasonable and ordinary meaning.") (New York law).

[18] Laurin testified that

> I talked to everybody, anybody that would like to consider developing a plasma-derived product or a derived product, that it would be a good idea to also add a [REDACTED].  But it adds.  It's an add-on.

> It would be like you saying, I want a car.  And you say, well, given you live in New Jersey, and summer is very hot, I would recommend you buy a car with an air-conditioning.  This is an option, but you're going to have four months of ordeal if you don't have an air-conditioning in your car.

> So [REDACTED] is the car and the prion removal is an add-on that makes the thing even better, but they're two separate thing[s].

HealthPro next argues that [REDACTED] and PRT are both applications of Prometic's Mimetic Ligand™ Technology ("MLT").[19] But the fact that [REDACTED] and PRT both employ MLT does not assist HealthPro.  Schedule A to the May 31 CSA lists [REDACTED] and does not list MLT.  Thus, the fact that both [REDACTED] and PRT use ligand technology to achieve their separate goals is insufficient to create a disputed issue of fact as to whether a transaction regarding PRT "relates to" [REDACTED] for purposes of the May 31 CSA.

In sum, the evidence on which HealthPro relies demonstrates that [REDACTED] and PRT are complementary technologies that may be used separately or sequentially to treat blood products. This is insufficient to bring the 2009 Collaboration Agreement within the purview of the May 31 CSA.  The May 31 CSA lists the five technologies to which the agreement applies, and PRT is not among them.  Nothing in the May 31 CSA suggests that Prometic owes HealthPro a Success Fee based on transactions addressed to technologies that are not listed on Schedule A but that complement the technologies on Schedule A.  Such a reading would defeat the purpose of listing specific technologies governed by

---

[19] Ligands are small molecules, each type of which binds to a specific protein.  Both [REDACTED] and PRT use ligands.  One does so to extract therapeutic proteins, the other to filter prions.

the document and eviscerate the parties' effort to cabin their obligations.

Next, HealthPro emphasizes a component of the definition of [REDACTED] contained on Schedule A. Schedule A of the May 31 CSA defines [REDACTED] as a scheme to develop [REDACTED] (Emphasis supplied.) HealthPro contends that since PRT is applied to proteins derived from [REDACTED], PRT falls within Schedule A since any application of PRT to plasma proteins results in a product "derived from" [REDACTED]. This argument, however, is factually inaccurate as it assumes that PRT can <u>only</u> be applied to proteins that are isolated using [REDACTED] when, as the 2008 [REDACTED] Agreement demonstrates, PRT can be applied to proteins obtained from alternative sources and/or derived by alternative means. Thus, while products derived from [REDACTED] are included within the Schedule A definition, the PRT process -- which may or may not be applied to these products -- is not.

Finally, HealthPro argues that any follow-on investment that Abraxis made in Prometic was "necessarily" an investment that triggered Prometic's obligation to pay HealthPro a Success Fee. HealthPro and Prometic could have structured the May 31 CSA in that way, but they did not. Instead, they limited the obligation to pay a Success Fee to investments relating to the technologies listed on Schedule A, <u>inter alia</u>. Under the

unambiguous terms of the May 31 CSA, HealthPro is not entitled

to a Success Fee based on the 2009 Collaboration Agreement.


II. 2010 Abraxis Transaction

     Both parties have moved for summary judgment on HealthPro's

fifth claim for relief, which seeks payment of a Success Fee

under the May 31 CSA in connection with both components of the

2010 Abraxis Transaction:  the 2010 SPA and the 2010 Loan.

Neither the 2010 SPA nor the 2010 Loan refer to any of the

technologies listed on Schedule A of the May 31 CSA.  But, if

either component of the 2010 Abraxis Transaction "relates to"

one of the technologies enumerated in Schedule A of the May 31

CSA, HealthPro is entitled to a Success Fee.

     A. 2010 SPA

     Pursuant to the 2010 SPA, Prometic issued warrants to

Abraxis that represent a potential $20 million additional

investment in Prometic (the "2010 Warrants").  These warrants

were exchanged for the warrants that had been issued to Abraxis

pursuant to the 2008 SPA (the "2008 Warrants").[20]  Since Prometic

---

[20] In addition to correspondence referring to the 2010 Warrants
as a "revise[d]" version of the 2008 Warrants, the two sets of
warrants are almost identical: both represent a potential $20
million additional investment and contain the same strike price
of $.47 per share.  The only material difference between the
2008 and 2010 Warrants is that the 2010 Warrants will expire
five years later than the date on which the 2008 Warrants were
set to expire.

concedes that the issuance of the 2008 Warrants arose from transactions related to the technologies covered by the May 31 CSA, it is obliged to pay HealthPro a Success Fee based on the 2010 Warrants.  HealthPro's motion for summary judgment on this claim is therefore granted.  In the event Abraxis exercises the 2010 Warrants, HealthPro is entitled to recover a five percent Success Fee.[21]

The evidence on which Prometic relies does not create a genuine dispute of fact regarding this claim.  Prometic's Senior Legal Counsel testified that the "2008 Warrants were not exchanged for the 2010 Warrants."[22]  A conclusory assertion is

---

[21] HealthPro has also moved for summary judgment on Prometic's affirmative defense that HealthPro materially breached the May 31 CSA by failing to provide services in connection with the 2010 Abraxis Transaction.  It is not necessary to reach this issue since it is undisputed that HealthPro performed services in connection with the 2008 Abraxis Transaction, and that those services give HealthPro a right to recover a success fee based on the 2010 SPA.

[22] The attorney also testified

> The 2008 Warrants were cancelled at Prometic's request, because if those warrants were in place when the 2010 Financing Transaction closed, that transaction could have been viewed as a financing by a "related" company under operative Canadian securities regulations, imposing additional regulatory hurdles to approval of the transaction.

The motive for exchanging the warrants is immaterial to the instant dispute.  Whether the parties exchanged the warrants at Prometic's request or to increase Abraxis's chance to exercise

insufficient to rebut the substantial evidence indicating that the 2010 Warrants replaced the 2008 Warrants.  See Ridinger v. Dow Jones & Co., 651 F.3d 309, 317 (2d Cir. 2011).

B. 2010 Loan

There is no evidence indicating that the 2010 Loan is related to any of the technologies included in the May 31 CSA.[23] Thus, Prometic's motion for summary judgment on this claim is granted.

HealthPro principally contends that it is entitled to a Success Fee on the 2010 Loan based on evidence indicating that this investment was linked to PRT.  This argument is unavailing. For the reasons discussed supra, PRT and [REDACTED] are distinct technologies and only transactions relating to [REDACTED] are covered by the May 31 CSA.

The only other evidence on which HealthPro relies is Wendel's testimony that during the negotiations surrounding the 2010 Abraxis Transaction, Laurin proposed that the parties continue collaborating on the three Orphan Proteins for which development had been put on hold.  It is undisputed that the use of [REDACTED] under the May 31 CSA.  There is no evidence,

---

the warrants while they were "in the money," the 2010 Warrants are a replacement for the 2008 Warrants.

[23] The parties also dispute whether the 2010 Loan is a "strategic investment" within the meaning of the May 31 CSA.  It is not necessary to reach this argument.

however, that the parties have actually revived their work in
this area.  Indeed, Wendel explained that [REDACTED]  Even if it
were appropriate to consider this extrinsic evidence, these
statements are insufficient to support a finding that the 2010
Abraxis Transaction relates to [REDACTED], such that Prometic
now owes a Success Fee from that loan.


III. Claims Relating to the 2008 Abraxis Transaction

  A. Project Fee:  300,000 Options for Prometic Stock with a
     Cashless Exercise Provision

    HealthPro asserts that the warrants Prometic granted it
"upon the date of execution" of the 2008 Abraxis Transaction
failed to contain a "cashless exercise provision."  Prometic
does not dispute that pursuant to the May 31 CSA the "options
issued to HealthPro should contain a cashless exercise
provision."  HealthPro's motion for summary judgment on this
claim is granted.

  B. Success Fee on Royalties from the 2008 [REDACTED] License
    Agreement

    The parties each move for summary judgment on HealthPro's
claim that it is entitled to five percent of all royalties that
Abraxis pays to Prometic in connection with the 2008 [REDACTED]
License Agreement.  This claim hinges on the May 31 CSA
provision defining the "Total Consideration" on which

HealthPro's Success Fee is based.  Pursuant to this provision,

Total Consideration includes

> any contingent consideration that becomes payable
> upon the occurrence of such contingency and other
> post-closing adjustment, if any, of such purchase
> price, licensing fee and contingent consideration,
> including, but not limited to strategic investments,
> and/or milestone payments upon such payments being
> paid to and having been received by [Prometic] . . .
> .

(Emphasis supplied).  This definition of contingent

consideration is in addition to several other categories of

compensation, such as the cash purchase price, an upfront

licensing fee paid to Prometic, and the value of shares issued

to Prometic in the transaction.  Prometic paid HealthPro

$350,000 at the closing of the 2008 [REDACTED] Transaction, or

5% of the $7 million strategic investment Abraxis made in

HealthPro.  Prometic admits that HealthPro may earn an

additional Success Fee if milestone payments are paid, for

instance, if certain regulatory approvals are obtained or sales

milestones are reached, but disputes that it is required to pay

HealthPro 5% of any royalties paid by Abraxis to Prometic

pursuant to the 2008 [REDACTED] License.

Prometic has shown that it is entitled to summary judgment

on HealthPro's claim that royalty payments to Prometic are

contingent consideration.  Royalty payments are generally

understood to be payments from a licensee to a licensor based on

27

revenues derived from licensed intellectual property and pursuant to a set formula. For example, Black's Law Dictionary (9th ed. 2009) defines "royalty" as "[a] payment -- in addition to or in place of an up-front payment -- made to an author or inventor for each copy of a work or article sold under a copyright or patent." Contingent consideration is typically defined as a future payment obligation between parties contingent on specified future events. See, e.g., Financial Accounting Standards Board, Business Combinations, Statement of Financial Accounting Standards No. 141R ¶ 3(a) (Fin. Accounting Standards Bd. 2007) ("Contingent consideration usually is an obligation of the acquirer to transfer additional assets or equity interests to the former owners of an acquiree if specified future events occur or conditions are met."). HealthPro has provided no reason to believe that the parties' agreements departed from this common usage. Indeed, there is a contingent fee that may be earned from milestone payments, i.e. payments made upon the occurrence of a future milestone event.

While the definition of contingent consideration in the May 31 CSA is broader than milestone payments, there is no basis to find that it would encompass royalty payments. If the definition were intended to capture royalty payments, it would have been incumbent on the parties to specifically list it. Royalty payments are customarily made in connection with sales

of a licensed product, unlike the compensation paid in connection with the execution of a strategic investment or similar transaction, as defined in the May 31 CSA.  For these reasons, the absence of any reference to royalty payments in the May 31 CSA definition of Total Consideration entitles Prometic to summary judgment on this claim.

C. Prometic's Counterclaim

Prometic belatedly seeks return of half of the Success Fee paid to HealthPro in connection with the 2008 Transaction because Laurin had a preexisting relationship with Soon-Shiong. The May 31 CSA provides that if

> a Covered Party in a Transaction is . . . an entity
> or person whom [Prometic] has already contacted or
> held discussions with . . . regarding a potential
> Transaction . . . the Success Fee shall be reduced by
> fifty percent (50%) of that which would otherwise be
> applicable . . . .

As was discussed above in the context of the 2009 Collaboration Agreement, "Transaction" is defined to include only those "collaborations" related to the technologies listed on Schedule A of the May 31 CSA.  Thus, in order for HealthPro to receive a reduced Success Fee, Prometic must establish that it had prior conversations with Abraxis relating to the technologies listed in the May 31 CSA.

While it is undisputed that Prometic's Laurin knew Soon-Shiong prior to the 2008 Abraxis Transaction, Prometic has failed to proffer any evidence that Laurin and Soon-Shion ever discussed the Schedule A technologies prior to the meeting convened by HealthPro on May 13, 2008.  In his deposition, Laurin admitted that before 2008 he and Soon-Shiong had not had any conversations "about any possibility of doing business related to any of the technologies on Schedule A" of the May 31 CSA.  Accordingly, HealthPro's motion for summary judgment on Prometic's counterclaim is granted.


IV. HealthPro's Claims for Expenses and Attorneys' Fees

Finally, HealthPro claims that it is entitled to recover $1,828.48 in expenses relating to the 2008 Abraxis Transaction and attorneys' fees incurred in connection with this litigation pursuant to the "Indemnity" clause of the May 31 CSA.  That provision states

> [Prometic] agrees to indemnify [HealthPro] . . . from any liability, claim or expense, including reasonable attorneys' fees, arising out of or in connection with this Agreement or the Services of [HealthPro] hereunder except to the extent such liability claim or expense is attributable to [HealthPro's] breach . . . gross negligence or intentional misconduct[.]

This contract term also provides parallel indemnification in favor of Prometic from HealthPro, and further states that neither party shall be liable "for consequential, special,

incidental, punitive, or indirect damages" in connection with
the May 31 CSA even if the parties had "been advised of the
possibility of such damages."

"Delaware law requires indemnification clauses to be clear
and unequivocal -- if a contrary intent can reasonably [be]
entertained, the Court will rule against indemnification." DRR
L.L.C. v. Sears, Roebuck and Co., 949 F.Supp. 1132, 1143 (D.Del.
1996) (citation omitted). "As a general proposition, attorneys'
fees and expenses may be recovered pursuant to an
indemnification agreement when they are incurred as a result of
defending the claims as to which indemnity was promised."
Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc., 394 A.2d
1160, 1165 (Del. Sup. Ct. 1978) (citation omitted).
Indemnification provisions are construed narrowly under Delaware
law to cover claims by third parties but not claims as between
the contracting parties. See Chase Manhattan Mortgage Corp. v.
Advanta Corp., No. Civ.A.01-507-KAJ, 2005 WL 2234608, at *22
(D.Del. 2005); Pinkert v. John J. Olivieri, P.A., No.Civ.A. 99-
380-SLR, 2001 WL 641737, at *6 (D.Del. 2001); see also DRR
L.L.C., 949 F.Supp. at 1142; Oliver B. Cannon and Son, 394 A.2d
at 1165.

The May 31 CSA contains a standard provision indemnifying
HealthPro for any liability, up to and including attorney's
fees, incurred in a suit brought by a third party.  It does not,

consistent with Delaware law, indemnify HealthPro for legal fees
or expenses incurred in a suit between the contracting parties.
Summary judgment is granted to Prometic on HealthPro's second
and seventh claims.


CONCLUSION

    The parties' May 23, 2011 cross-motions for summary
judgment are granted in part.  Prometic's motion for summary
judgment on HealthPro's claim pertaining to the 2009
Collaboration Agreement is granted and its motion for summary
judgment on HealthPro's claims relating to the 2010 Abraxis
Transaction is granted in part:  HealthPro may recover a Success
Fee if Abraxis exercises any of the warrants it received
pursuant to the 2010 SPA; however, it is not entitled to a
Success Fee based on the 2010 Loan.  With respect to the 2008
Abraxis Transaction, HealthPro's motion for summary judgment
regarding its request for an Order directing Prometic to grant
it 300,000 stock options with a cashless exercise provision is
granted.  HealthPro's motion for summary judgment on its request
for a declaration that it is entitled to recoup a Success Fee
for any royalties Prometic receives in connection with the 2008
[REDACTED] License Agreement is denied, and Prometic's motion
for summary judgment on this claim is granted.  HealthPro's
motion for summary judgment is granted with respect to

Prometic's counterclaim seeking return of half of the Success Fee paid to HealthPro in connection with the 2008 Abraxis Transaction.  Finally, Prometic's motion for summary judgment on HealthPro's claims for attorney's fees and expenses is granted, and HealthPro's motion for summary judgment on these claims is denied.

    SO ORDERED:

Dated:    New York, New York
        November 8, 2011

                                      DENISE COTE
                  United States District Judge